Ralph J. PERK, Plaintiff–Appellant,
Cross–Appellee,

v.

The READER'S DIGEST ASSOCIATION,
INC., and Eugene H. Methvin, Defendants–Appellees, Cross–Appellants.

Nos. 89–4111, 90–3030.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 4, 1991.

Decided May 1, 1991.

Nicholas M. DeVito (argued), Cleveland, Ohio, for plaintiff-appellant cross-appellee.

Kenneth A. Zirm, Michael T. McMenamin (argued), Christopher L. Gibbon, Walter, Haverfield, Buescher & Chockley, Cleveland, Ohio, Michael Brizel, The Reader's Digest Ass'n, Inc., Pleasantville, N.Y., David Otis Fuller, Jr., The Readers' Digest Ass'n, New York City, for defendants-appellees cross-appellants.

Before KENNEDY and NORRIS, Circuit Judges; and MILES, Senior

District Judge.[*]

KENNEDY, Circuit Judge.

The plaintiff, Ralph Perk (appellant), appeals the District Court's grant of summary judgment to the defendants, the Reader's Digest Association and Eugene Methvin (appellees), in this libel case. The appellant claims that the District Court erred by analyzing each allegedly libelous statement individually rather than examining the article as a whole. The appellees respond, claiming that they relied on reputable sources in their article "Cleveland Comes Back" (the article), and that therefore the District Court's grant of summary judgment was proper. Having thoroughly examined the record, including the sources used for the article, we AFFIRM the District Court's grant of summary judgment.

## BACKGROUND

The appellant followed Carl Stokes as mayor of Cleveland in November 1971, and remained in that office until November 1977. In November of 1978, during Dennis Kucinich's tenure as mayor, Cleveland was unable to renew its short term notes and defaulted. In 1982, appellee Eugene Methvin, an editor for Reader's Digest, began a story about Cleveland's comeback from its financial difficulties. The article, "Cleveland Comes Back," was published in Reader's Digest in March 1983. In that article, which is the source of this lawsuit, George Voinovich, who became mayor in 1979, was praised for bringing Cleveland back to fiscal soundness and his predecessors, including appellant, were portrayed as fiscally irresponsible, and the cause of Cleveland's default. The appellant sued Reader's Digest and Methvin, claiming that the article was libelous. The appellees moved for summary judgment, which the District Court granted.

Perk appeals, claiming that Methvin set out to tell the positive comeback story of Mayor Voinovich, and intended to do so by painting a negative picture of his predeces-

sors. The appellant claims that the article as a whole presented untruths or exaggeration that the appellant failed to operate Cleveland with a balanced budget, and generally mismanaged the city's funds. He contends that Methvin relied on dubious sources who had reasons to cast the appellant's administration in a negative light. Methvin admits that he did not interview anyone from the appellant's administration, although he interviewed at least one member of every other administration mentioned in the article. The article's editor at Reader's Digest, Heather Chapman, noted the sources used for each part of the story, and made suggestions where she believed that something should be stated differently. The appellant claims that because the sources used were either known to be biased, or presented information that should have alerted the appellees that the story was untrue, Methvin and Reader's Digest showed reckless disregard for whether the article was truthful.

The following is the only portion of the article that is relevant to this appeal:

When Stokes retired in 1971, frustrated and disillusioned, Kucinich led a white Democratic rump movement that helped elect Republican Ralph Perk mayor.

Used to being maligned, Cleveland became the butt of national jokes when Perk set his own hair afire cutting a ceremonial metal ribbon with an acetylene torch. Reporters dubbed his administration "municipal vaudeville," and neither media nor public paid due attention to the fiscal flames.

And burn they did. Perk sold Cleveland's transit system for $10 million and the sewer system for $33 million to regional authorities, and used the money for current spending, including, some said, heavily padded payrolls. Deficits were concealed with such budget foolery as classifying uncollectible bills as collectible. Federal grant dollars were wasted on such dubious projects as bus placards and billboards—prominently dis-

---

[*] The Honorable Wendell A. Miles, Senior Judge, United States District Court for the Western District of Michigan, sitting by designation.

playing the mayor's name—urging citizens to fight crime. Promising no new taxes, Perk won re-election twice.

. . . .

Rock Bottom. With the city near collapse, Kucinich's finance director, Joe Tegreene, discovered a new nightmare: to pay day-to-day expenses, the Perk administration had taken $30 million from the proceeds of long-term bond funds obligated for repairing roads and bridges and for other capital investments. Almost instantly, Wall Street financial experts dropped Cleveland's credit rating to zero.

The appellant claims that several parts of the article evidence reckless disregard for the truth. First, the appellant claims that the article misrepresented the "sale" of the sewer and transit systems. According to the appellant, there was no sale, but instead a legislative transfer of those systems to a regional authority. That transfer brought federal revenue to the systems, and the city was reimbursed for improvements it had made, and for parking lot land that it turned over for use with the transit system.

The appellant also claims that the article falsely stated that deficits were concealed by classifying uncollectible bills as collectible. This allegedly false statement was compounded by the inflammatory characterization of Perk's record keeping as "budget foolery." According to the information submitted by appellant in response to the summary judgment, his administration balanced the budget each year, and no uncollectible receivables were classified as revenue since the city's financial records were kept on a modified cash basis under which no receivables were listed as revenue or assets.

Appellant contends next that the statement referring to padded payrolls was false. The appellant states in his affidavit that he reduced the payroll from 13,000 to 10,000 city workers. Because one source on which Methvin relied stated that it had never been proved, and another told Chapman that Perk had reduced the payrolls, Chapman recommended that the statement be revised. Appellees then added "some say" before publication.

The appellant also contends that his administration never used proceeds from long term bond funds for daily expenses, and that no federal money was spent on bus placards and billboards with the mayor's name on them. In addition, although during his campaigns the appellant declared that he was against raising taxes, he did call for an income tax increase which the voters rejected, and he also supported a sales tax increase, which passed.

The editor cited numerous sources for the article, including several newspaper and magazine articles, as well as interviews with members of other city administrations and political analysts.[1] The appellant claims that Methvin knew that most of the individuals who were interviewed for the article were biased. The appellant also claims that the very articles used as sources by the appellees contained information which should have alerted them to the fact that their story was untruthful.

## DISCUSSION

### I. Summary Judgment

The parties agree that for the purposes of this libel suit the appellant is a

---

1. The following sources were used by Methvin for that part of the article that discussed the appellant or his administration:

Source 1: Professor Thomas Campbell of Cleveland State University
Source 6: Phil Allen, Voinovich's budget director
Source 18: Newsweek, "Oh! Cleveland" 1/1/79
Source 32: Barron's 5/19/80
Source 33: Cleveland Magazine (by E. Whelan)
Source 36: Cleveland Press 2/23/80

Source 42: The Nation 3/24/79
Source 43: Congressional subcommittee hearing
Source 49: Wall Street Journal 8/9/78
Source 52: San Francisco Examiner 1/3/79
Source 55: New York Times 12/13/78
Source 70: New York Times 12/15/78 (also listed as source 58)
Source 78: Cleveland Plain Dealer
Source 83: Philip Dearborn, Carl Stokes' finance director
Source 88: Joe Tegreene, Kucinich's finance director

public figure and in order to prevail against a motion for summary judgment, the appellant must show that he can prove at trial that the statements: (1) are false; and (2) were each made with knowledge that they were false or made with reckless disregard for their truth or falsity. *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The appellant can present proof of malice in the form of cumulative circumstantial evidence, which is often the only way to prove malice in libel cases. *See Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). Therefore, in reviewing the District Court's decision, this Court must examine the portions of the article to which appellant objects in the context in which they were presented, not in isolation.

■ The appellant claims that the appellees intended to write a story with a particular slant. The story was to be of the success of Cleveland's mayor following the failure of its previous mayors. The appellees' motives alone, however, "cannot provide a sufficient basis for finding actual malice." *Id.* 109 S.Ct. at 2684. The motive is, however, circumstantial evidence which, when combined with other evidence, may amount to malice.

■ The appellant also contends that Methvin failed to investigate the truthfulness of the article by failing to interview any members of Perk's administration, and by failing to follow up on statements contained within the very sources used by Methvin. "Although failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category." *Id.* at 2698 (citation omitted). In *Harte–Hanks*, the Supreme Court held that the reliance on an informant whose veracity was questionable, and failure to interview a witness who had access to the same facts, amounted to malice because it was evidence of intent to avoid the truth. Methvin's failure to investigate, therefore, may be considered as part of the evidence of malice, particularly if Methvin's own sources indicated that what he was writing might not

be true. In analyzing whether the appellant could show malice, this Court must look at each source to determine whether it was reliable and whether it indicated that more research was required to determine what the truth was. In the end, all of the statements may be considered together to determine whether they as a whole can show recklessness.

Chapman's notes indicate that several sources were used to verify the article. Appellant claims that many of the individuals interviewed for the article were unreliable, and that many newspapers and other periodicals cited as sources often quote individuals whom the appellant claims appellees knew were biased. The appellant also claims that several sources used by the appellees actually indicate that the statements contained in the article were false.

■ Methvin does admit that one source, Joe Tegreene, who was the budget administrator during Kucinich's administration when Cleveland defaulted, was biased against Perk. Also, one article cited by the appellees as one of their sources did include statements that did not support what the appellees published. That article, "Cleveland's Crisis a Decade in Making," from the *New York Times*, states that Perk obtained considerable federal funds to alleviate the financial problems, and that he kept a balanced budget. The article does note, however, that he was criticized for using proceeds from capital sales for general operating expenses.

The overwhelming number of sources, however, support the picture presented in the article. Several sources describe the transfer of the sewer and transportation systems as a sale, and include information about Perk's use of at least part of those proceeds to cover daily expenses. Although several sources indicate that Perk did support tax hikes, it is not disputed that he ran on a platform which included not raising taxes, which is exactly what the article stated. Many sources support the contention that Perk did not balance the budget in reality, although the practice of borrowing funds from one account to pay the bills of another account gave the ap-

pearance of a balanced budget. Numerous sources indicate that the account books during the Perk administration were unauditable, that federal funds were misused, and that millions of dollars of bond money was inappropriately spent to support the daily operations of the city. Although there is only one source for the statement that Perk's administration classified uncollectible receivables as collectible, there is also nothing within the sources to indicate to the appellees that that statement was false.

Appellant contends that the appellees had a responsibility to research each of these issues more thoroughly. The appellant cites the Supreme Court's decision in *Harte–Hanks* as support for this contention. *Harte–Hanks,* however, presented a unique situation in which the newspaper's own sources indicated that there was a question as to the truth of what they were reporting, and that a readily available additional source would provide proof of whether their story was accurate. There is little or nothing in appellees' sources to indicate to them that their sources were inaccurate on these issues.

We next consider the statement about padded payrolls. Chapman indicated in her notes that Joseph Tegreene told her that payrolls had actually been higher under the administration prior to Perk's, and another source told her that it had never been proven that Perk padded payrolls. A third source, however, stood behind that statement, and the appellant offers nothing else to indicate that the appellees knew it was false. The appellees had several sources which stated that appellant did pad payrolls. Among those sources was former mayor Kucinich's testimony before the congressional subcommittee that investigated the role of the banks in Cleveland's default. Although Kucinich may be considered biased, his statement could reasonably be afforded greater weight because it was made, not in an election speech, but to a congressional subcommittee.

The situation here is different from that involved in the *Harte–Hanks* case. There, not only was the credibility of the source the newspaper used known to be doubtful, but the newspaper could easily have ascertained the truth by interviewing a known witness. Here, the fact of padded payrolls is not something that could be easily proved or disproved by the testimony of one individual. The meaning of the statement that an administrator pads payrolls is in itself rather ambiguous. Some of those who made the allegation were referring to their claim that Perk appointed his friends and supporters to new middle management positions and put political hacks on the payroll. There may be a difference of opinion of whether that practice, even if true, constitutes padding payrolls, but "[d]ifference of opinion as to the truth of a matter … does not alone constitute clear and convincing evidence that the defendant acted with a knowledge of falsity or with a 'high degree of awareness of … probable falsity.'" *Harte–Hanks,* 109 S.Ct. at 2693 (quoting *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 215–16, 13 L.Ed.2d 125 (1964)). Even Tegreene's statement that payrolls were larger under Stoke's administration does not necessarily suggest that Perk did not pad payrolls, because the number of people on the payroll or the money spent on payroll is not necessarily conclusive as to whether the payroll is padded.

After an independent examination of the record, therefore, this Court concludes that the District Court's holding that Perk could not prove reckless disregard was correct. Although the article portrays the appellant in a negative manner, appellees have no legal obligation to present a balanced view of what led up to Cleveland's default. Nor are they liable for failing to perform the thorough professional investigation Perk would have preferred. The appellant has not presented " 'sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.'" *Harte–Hanks,* 109 S.Ct. at 2696 (quoting *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325–26, 20 L.Ed.2d 262 (1968)).

The District Court's grant of summary judgment is therefore AFFIRMED.

## II. Sanctions

Appellee cross-appeals the District Court's denial of sanctions against the appellant. The District Court, however, correctly denied the motion for sanctions because any duty to continually evaluate pleadings filed in a case was not violated here. The pleadings were not without merit. The appellant's effort to prove libel was warranted under existing libel law, and therefore does not call for sanctions.

The District Court's denial of appellees' motion for sanctions is therefore AFFIRMED.