*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0336p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

COMPUWARE CORPORATION,

      *Plaintiff-Appellant,*

      *v.*

MOODY'S INVESTORS SERVICES, INC.,

      *Defendant-Appellee.*

No. 05-1851

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 03-70247—John Feikens, District Judge.

Argued: December 6, 2006

Decided and Filed: August 23, 2007

Before: BATCHELDER, GILMAN, and ROGERS, Circuit Judges.

---

### COUNSEL

**ARGUED:** Mary Massaron Ross, PLUNKETT & COONEY, Detroit, Michigan, for Appellant. James J. Coster, Joshua M. Rubins, SATTERLEE, STEPHENS, BURKE & BURKE, New York, New York, for Appellee. **ON BRIEF:** Mary Massaron Ross, PLUNKETT & COONEY, Detroit, Michigan, for Appellant. James J. Coster, Joshua M. Rubins, SATTERLEE, STEPHENS, BURKE & BURKE, New York, New York, for Appellee.

BATCHELDER, J., delivered the opinion of the court, in which GILMAN, J., joined. ROGERS, J. (pp. 13-15), delivered a separate opinion concurring in part and dissenting in part.

---

### OPINION

---

ALICE M. BATCHELDER, Circuit Judge. Plaintiff-Appellant Compuware Corporation ("Compuware") appeals the district court's grant of summary judgment in favor of Defendant-Appellee Moody's Investors Services Inc. ("Moody's") on Compuware's claims of defamation and breach of contract. The district court found that Compuware needed to establish actual malice to succeed on both claims, and that Compuware failed to make the requisite showing of actual malice. On appeal, Compuware argues that it presented sufficient evidence of Moody's actual malice to withstand summary judgment and that, in any event, the actual-malice standard should not apply to its breach of contract claim. After careful consideration, we **AFFIRM**.

1

## I. Background

Moody's is a financial publisher that analyzes the financial conditions of, and publishes credit ratings for, a variety of companies. A Moody's rating is a predictive opinion of a company's future creditworthiness that is reached through a deliberative process involving a ratings committee. Each ratings analysis considers several objective factors, but is ultimately derived from the subjective weighing of those factors. Prior to publishing a credit rating, Moody's customarily provides the company being rated with the opportunity to review the proposed report to ensure that there are no factual misstatements and that no confidential information has been inadvertently disclosed. Moody's provides at least two different types of ratings: (1) an issuer rating, which reflects the company's overall creditworthiness, and (2) a credit facility rating, which reflects the company's ability to repay funds under a particular source of credit. Often, a company seeking to borrow funds must, as part of the loan process, ask Moody's, or a similar company, to publish its credit rating.

In late 1999, Compuware asked Moody's to rate its ability to repay funds borrowed under a $900 million revolving bank credit facility. On January 31, 2000, Moody's responded to Compuware's request with a letter confirming that it had assigned a rating of "Baa2," which is the second lowest of Moody's ten investment grade ratings, to Compuware's overall creditworthiness (i.e., the issuer rating) and Compuware's ability to satisfy its obligations under the $900 million credit facility (i.e., the credit facility rating). Attached to the letter was Moody's invoice for its ratings services, charging a $25,000 first-time issuer fee and a $200,000 long-term rating fee. There are no other writings memorializing the agreement.

As part of the contracted-for services, Moody's continued to monitor Compuware's financial situation, and in late 2001, Moody's observed downward market shifts, caused in part by the bursting of the "internet bubble," that might negatively impact Compuware's business. Moody's published a statement indicating that Compuware's credit rating was under review for a "possible downgrade." Fearing the backlash of a decreased rating and hoping to improve its financial situation, Compuware reduced the funds available under its revolving credit facility from $900 million to $500 million.

In early 2002, Moody's analyst John Moore began an intensive review of Compuware's financial situation. Moore learned that Compuware had recently filed a lawsuit against International Business Machines Corporation ("IBM"), charging IBM with unlawful copyright infringement and persistent anti-competitive behavior. This lawsuit greatly concerned Moody's because it demonstrated a major rift between Compuware and IBM — one of Compuware's most important business partners as well as one of its largest customers. The potential business risk created by this relational breakdown was significant, such that IBM's continued anti-competitive conduct posed the risk of driving Compuware out of business. Moody's sent a written request to Compuware, seeking more information about this lawsuit and Compuware's relationship with IBM, to which Compuware provided a cursory written response. Moody's was not the only financial publisher concerned with Compuware's situation at this time; other business-oriented publications also printed articles pessimistic about Compuware's prospects.

In July 2002, Moody's ratings committee — comprising Chairman Robert Konefal and Analysts John Moore, Deven Shah, and Richard Lane — convened to make a final decision on Compuware's rating. Compuware's debt situation appeared healthy: it had no outstanding funds under its $500 million credit facility; the credit facility was set to expire in a year; and the committee did not anticipate that Compuware would need to borrow funds during the upcoming year. In addition to its minimal debt, Compuware maintained significant liquid assets — including, among other things, $270 million in cash and $139 million in liquid investments — and $65 million in "other" investments to satisfy any debt obligations that might come due in the upcoming year.

Despite the apparently healthy condition of Compuware's balance sheet, the ratings committee remained pessimistic about Compuware's financial future and its ability to meet projected performance. This negative outlook derived largely from the breakdown of Compuware's relationship with IBM, Compuware's declining revenues, and an overall spending decrease in the area of information technology. Even though the ratings committee's prior memorandum recommended a three-level downgrade, the committee voted to impose only a two-level reduction, resulting in both an issuer rating and a credit facility rating of "Ba1," which is the highest of Moody's eleven non-investment grade (i.e., junk) ratings.

The proposed ratings report was ready on August 9, 2002, and John Moore wanted to publish it that day. Learning that Compuware's Chief Financial Officer Laura Fournier was out of town, Moore faxed a copy of the proposed report to Fournier's assistant, Jane Lee, for prepublication review. Lee convinced him to delay publication for three days until Fournier returned to the office. When Fournier returned to the office on August 12, 2002, she contacted Moore to discuss the ratings report, objecting, as a factual matter, to the inclusion of the word "Tivoli" in IBM's name and asking that it be deleted. Fournier also advised Moore that the ratings downgrade was unjustified given Compuware's current financial situation. Emphasizing that Compuware had no plans to borrow under the existing credit facility, she offered to terminate the facility immediately if it would improve the rating. Moore told Fournier that terminating the facility would not impact the rating because the committee had already concluded its assessment and issued its report. On August 13, 2002, Moody's published the ratings report, which was identical to the proposed report submitted for Compuware's review, except for the deletion of the word "Tivoli" as requested by Compuware.

The published report revealed several distressing details about Compuware's future: (1) Compuware's professional services department, which accounted for more than half of its business production, exhibited declining revenues; (2) Compuware's software department faced serious threats from its battle with IBM because more than 80% of its revenues derived from IBM-related products; (3) Compuware's entire business was vulnerable because of the slowdown in the market for information technology and the increase in competition from large software vendors; and (4) Compuware's anticipated capital expenditures would likely consume a majority of its projected free cash flow, leaving inadequate funds for other purposes. The ratings report also disclosed positive facts about Compuware's financial situation: (1) Compuware showed a "good balance sheet" with $270 million in cash, $139 million in liquid investments, and "no funded debt"; (2) Compuware maintained a "$500 million *undrawn* bank facility"; (3) Moody's expected Compuware to remain in compliance with the financial covenants of that credit facility; and (4) Compuware had been able to "generate solid cash flow from operations even in [a] down market." Two weeks after publication, Compuware reduced the amount available under its credit facility from $500 million to $200 million, and a few months later, Compuware terminated the facility entirely. Because Compuware no longer had any outstanding debt instruments, Compuware requested that Moody's withdraw its credit rating, which Moody's did in December 2002.

On January 21, 2003, Compuware filed suit against Moody's alleging breach of contract, defamation, silent fraud, and a violation of the Investment Adviser's Act. Moody's filed a Fed. R. Civ. P. 12(b)(6) motion to dismiss for failure to state claims upon which relief could be granted. The district court granted Moody's motion in part, dismissing Compuware's silent fraud and Investment Adviser's Act claims, and the parties conducted discovery on the breach of contract and defamation claims. In an order resolving a discovery dispute, the district court stated that Compuware could not succeed on its breach of contract claim unless it showed that Moody's "acted with actual malice or reckless disregard of the truth while performing the contracted-for services." Because, in the court's opinion, both the breach of contract claim and the defamation claim turned on the issue of actual malice, the court instructed Moody's to submit a summary judgment motion on that issue only; Moody's submitted its motion shortly thereafter. In its response, Compuware argued that there were

genuine issues of material fact on the issue of actual malice and, alternatively, that the actual-malice standard should not apply to its contract claim.

The district court granted summary judgment to Moody's on both the defamation and the breach of contract claims, holding that the actual-malice standard applied to both claims and that, taking all of the evidence submitted by Compuware as true, that evidence would not permit a jury to conclude that Moody's had acted with actual malice. The district court held, in the alternative, that if the negligence standard of defamation law applied rather than the actual-malice standard, Compuware had not presented sufficient evidence from which a reasonable juror could find that Moody's had acted negligently in publishing its report. Compuware filed a timely notice of appeal.

On appeal, Compuware raises three issues: first, that it produced sufficient evidence of actual malice to withstand summary judgment; second, that the district court erred in applying the actual-malice standard to its breach of contract claim; and third, that because the district court instructed the parties to address only the issue of actual malice on summary judgment, the court erred in reaching its alternative ruling that Moody's was not negligent. We will address these arguments in turn.

## II.  Standard of Review

"We review a grant of summary judgment *de novo*, applying the same test as used by the district court." *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1153 (6th Cir. 1995). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing a motion for summary judgment, we view the evidence, all facts, and any inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact." *Prebilich-Holland v. Gaylord Entm't Co.*, 297 F.3d 438, 442 (6th Cir. 2002). A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III.  The Defamation Claim

"[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. A plaintiff who qualifies as a public official or public figure may recover for defamation only if he produces *clear and convincing evidence* that the defendant acted with actual malice. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974). The parties do not dispute that Compuware, as a publicly held corporation, is a public figure for purposes of First Amendment defamation analysis. "When determining if a genuine factual issue as to actual malice exists in a [defamation] suit brought by a public figure, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability," meaning that the court must grant summary judgment to the defendant "if the evidence presented . . . is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence." *Anderson*, 477 U.S. at 254. The appellate court in defamation cases has an "obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984) (quoting *New York Times*, 376 U.S. at 284-86).

The actual-malice standard requires the plaintiff to prove that the defendant made the statement with knowledge of its falsity or with reckless disregard of its truth. *New York Times*, 376

U.S. at 279-80; *Gertz*, 418 U.S. at 342. "Reckless disregard of a statement's truth" is a subjective standard, *Harte-Hanks Commc'ns Inc. v. Connaughton*, 491 U.S. 657, 688 (1989); it is "not measured by whether a reasonably prudent man would have published[] or would have investigated before publishing," but by whether "the defendant in fact entertained serious doubts as to the truth of [its] publication," *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *see also Gertz*, 418 U.S. at 331 (recognizing that a defendant acts with reckless disregard when he displays a "high degree of awareness of . . . probable falsity"). While a defendant's failure to investigate, without more, does not establish a reckless disregard of the truth, the "purposeful avoidance of the truth is in a different category" and may be sufficient to establish actual malice. *Harte-Hanks*, 491 U.S. at 692; *Perk v. Reader's Digest Ass'n, Inc.*, 931 F.2d 408, 411 (6th Cir. 1991).

The district court began its actual-malice analysis with the issue of consent, noting that under Michigan law a plaintiff who consents to another's conduct may not assert a tort claim for harm resulting from that conduct. *See Smith v. Calvary Christian Church*, 614 N.W.2d 590, 593 (Mich. 2000). The court concluded that Compuware's review of Moody's ratings report prior to publication constituted consent to publication and "immunized [Moody's] from a suit in tort over any statement or omissions to which Compuware did not object." Viewing the facts in the light most favorable to Compuware, we think that the district court erred in finding consent. Compuware's CFO Fournier reviewed the proposed report and told Moody's that the ratings downgrade was unjustified. This statement, while somewhat vague and conclusory, indicates that Compuware did not agree with substantial portions of the report and, perhaps, that it did not want it to be published. The facts in the record at this stage of the proceedings do not support a blanket finding that Compuware consented to the report's publication. To be sure, Moody's offer to allow Compuware to review the report prior to publication greatly diminishes any indicia of actual malice, but a finding of consent is unwarranted on this record.

We nevertheless agree that Compuware has failed to produce sufficient evidence of actual malice to withstand summary judgment, especially in light of the clear-and-convincing evidentiary standard. Compuware first contends that Moody's exhibited actual malice by intentionally omitting important facts from the published report. According to Compuware, these key facts include Compuware's offer to terminate the entire credit facility, Compuware's statement that it likely would not borrow any funds under this facility, and $65 million of investments found on Compuware's balance sheet. Compuware, however, has not introduced any evidence suggesting that Moody's intentionally omitted these facts for the purpose of justifying its ratings downgrade or otherwise defaming Compuware. Instead, the undisputed evidence demonstrates that Moody's actively sought to compile a factually accurate and complete report. Prior to publication, Moody's sent Compuware a copy of its proposed report to review for accuracy. Moody's not only requested Compuware's prepublication review of the report, it actually implemented Compuware's only requested factual change (i.e., deletion of the word "Tivoli" from IBM's name), thus showing Moody's willingness to alter the report as to factual issues. But Compuware did not ask Moody's to include any of the "key factual omissions" to which it now objects, and, indeed, two of those "facts" were future contingencies, namely, Compuware's offer to terminate the credit facility entirely and its representation that it would probably not borrow against it. Moody's efforts to ensure the accuracy of the facts in its report as of the date of that report belie any contention that Moody's intentionally omitted essential facts. Even without this prepublication review, we note that a defendant's failure to include every relevant and potentially positive detail in its publication is insufficient to establish actual malice. *See Perk*, 931 F.2d at 412 (noting that a publisher has "no legal obligation to present a balanced view" in its article).

Compuware next argues that Moody's exhibited actual malice by assigning analysts with a conflict of interest to review Compuware's financial condition. Compuware contends that because of the legal battles between itself and IBM, any Moody's analyst assigned to Compuware's ratings committee should not have been involved in rating IBM. Specifically, Compuware asserts that

Robert Konefal, chairman of the Compuware ratings committee, had a conflict of interest because he worked with a group of analysts who monitored technology companies, including both IBM and Compuware. Aside from these bare allegations of a "conflict of interest," Compuware has provided no evidence that Konefal, or any other Moody's analyst, was actually prejudiced against Compuware, or, for that matter, biased in favor of IBM. Neither does Compuware demonstrate why a Moody's analyst would curry favor with IBM by assigning a lower rating to Compuware or, put differently, why IBM desired or would otherwise benefit from Compuware's ratings downgrade. And assuming that such a conflict of interest existed, the defendant's self-serving or even vindictive motives, without more, do not provide a sufficient basis for finding actual malice. *Perk*, 931 F.2d at 411; *see also Harte-Hanks*, 491 U.S. at 667-68 (instructing courts to refrain from giving excessive weight to the defendant's motives when evaluating actual malice).

Compuware next argues that Moody's demonstrated actual malice by failing to investigate adequately Compuware's rift with IBM. "[M]ere proof of failure to investigate, without more, cannot establish reckless disregard [of] the truth," *Gertz*, 418 U.S. at 331, but the defendant's purposeful avoidance of the truth may be sufficient to demonstrate actual malice, *Harte-Hanks*, 491 U.S. at 692; *Cobb v. Time, Inc.*, 278 F.3d 629, 639-40 (6th Cir. 2002). Moody's unquestionably investigated the conflict between Compuware and IBM; in fact Moody's investigated this issue using one of the most effective means possible — by going directly to Compuware and requesting further information about its relationship with and litigation against IBM. Moody's provided Compuware with a unique opportunity unavailable to most alleged victims of defamation: a chance to assist in the defendant's prepublication investigation to ensure it was adequate and complete. But Compuware squandered this opportunity, providing only a short, virtually fact-free, one-paragraph response to Moody's inquiry. Compuware now attempts to use against Moody's this cursory response, arguing that Moody's should have investigated the issue further. But this sort of argument is not supported by precedent. The relevant legal inquiry focuses on the extent of the defendant's efforts to avoid the truth, not the extent of the defendant's investigation to discover the truth. *See Perk*, 931 F.2d at 411-12. Because Moody's actively sought to learn about the relationship and litigation between Compuware and IBM, any alleged investigatory deficiencies are insufficient to establish actual malice. *See id.* at 412 (holding that the defendants were not "liable for failing to perform the thorough professional investigation [the plaintiff] would have preferred"). Furthermore, Moody's investigatory efforts, even if less than those of a reasonably prudent person, belie any argument that Moody's purposely avoided the truth. *See Lothschuetz v. Carpenter*, 898 F.2d 1200, 1206 (6th Cir. 1990) (noting that reckless disregard "requires more than a departure from reasonably prudent conduct").

Finally, Compuware directs this court to minor inconsistencies in the testimony of Moody's representatives as evidence of actual malice. For example, Moody's Analyst John Moore told Compuware that terminating the facility would not improve the credit rating because the committee had already concluded its assessment and issued its report. At his deposition, however, Moore stated that, even after a committee has voted on a rating, Moody's remained "open to the possibility of revising credit ratings instantaneously." We find that these minor inconsistencies on tangential issues, while relevant circumstantial evidence, *see Perk*, 931 F.2d at 411, are not sufficient to establish actual malice by clear and convincing evidence. The sum total of all Compuware's evidence is insufficient to permit a reasonable juror to find that Moody's "entertained serious doubts as to the truth of [its] publication," *see St. Amant*, 390 U.S. at 731, and Compuware is unable to withstand summary judgment on the issue of actual malice.

In addition to a lack of evidence on the issue of actual malice, we note more fundamental problems with Compuware's defamation claim. Unlike a typical defamation claim, which challenges false statements of fact, Compuware contends that Moody's report omitted key facts and implied incorrect connotations about Compuware's business practices. Compuware believes that because its records displayed a financially healthy company, Moody's ratings downgrade defamed

Compuware by wrongfully implying (1) that Compuware's balance sheet and financial statement misrepresented the company's true financial condition and (2) that Compuware would not pay its debts even if it had sufficient funds to do so.

"[A] plaintiff can bring a claim for defamation when discrete facts . . . are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way." *Green v. CBS Inc.*, 286 F.3d 281, 284 (5th Cir. 2002). In such situations, however, "where the plaintiff is claiming defamation by innuendo, he . . . must show with clear and convincing evidence that the defendant[] intended or knew of the implications that the plaintiff is attempting to draw from the allegedly defamatory material." *Saenz v. Playboy Enters., Inc.*, 841 F.2d 1309, 1318 (7th Cir. 1988); *see also Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) (noting that defamation arises from a statement that "reasonably implies false and defamatory facts" only where the plaintiff "show[s] that such statements were made with knowledge of their false implications or with reckless disregard of their truth"); *Newton v. Nat'l Broad. Co., Inc.*, 930 F.2d 662, 681 (9th Cir. 1990) (noting that the defendant was not liable for defamation because the plaintiff did not establish that the defendant "intended to convey the defamatory impression at issue"). Compuware has not met this burden, utterly failing to demonstrate that Moody's intended or knew of the implied messages Compuware attributes to the ratings report. Compuware has not even shown that an objective reader of the ratings report might discern these hidden implications; indeed only a "strained reading" of the report would permit the inferences Compuware would have us draw. *See Howard v. Antilla*, 294 F.3d 244, 254 (1st Cir. 2002).

To the extent Compuware alleges that the *credit rating itself* was defamatory, as opposed to the facts or implications in the report, Compuware has failed to assert a cognizable defamation claim. A defamation claim against a media defendant cannot derive from "a statement of opinion relating to matters of public concern [that] does not contain a provably false factual connotation," *Milkovich*, 497 U.S. at 20, or from "statements that cannot 'reasonably [be] interpreted as stating actual facts,'" *id.* (quoting *Hustler Magazine v. Falwell*, 485 U.S. 46, 50 (1988)) (alteration in original). Put differently, a viable defamation claim exists only where a reasonable factfinder could conclude that the challenged statement connotes actual, objectively verifiable facts. *Id.* at 21; *Parks v. LaFace Records*, 329 F.3d 437, 462 (6th Cir. 2003). A Moody's credit rating is a predictive opinion, dependent on a subjective and discretionary weighing of complex factors. We find no basis upon which we could conclude that the credit rating itself communicates any provably false factual connotation. Even if we could draw any fact-based inferences from this rating, such inferences could not be proven false because of the inherently subjective nature of Moody's ratings calculation.

For the foregoing reasons, we affirm the district court's dismissal of Compuware's defamation claim.

## IV. The Breach of Contract Claim

The district court required Compuware to show actual malice in order to prevail on its breach of contract claim. On the specific facts of this case, we affirm the district court's application of the actual-malice standard to this claim.

Ordinarily, "enforcement of . . . general laws against the press is not subject to stricter scrutiny than would be applied to enforcement against other persons or organizations." *Cohen v. Cowles Media Co.*, 501 U.S. 663, 670 (1991). But stricter scrutiny may be warranted where a plaintiff attempts to use a state-law claim "to avoid the strict requirements for establishing a libel or defamation claim." *Id.* at 671; *see, e.g.*, *Falwell*, 485 U.S. at 50. In *Falwell*, the Supreme Court considered whether the actual-malice standard should apply to a state-law tort claim of intentional infliction of emotional distress. The defendant in *Falwell* published a deeply offensive satiric cartoon about the plaintiff, and the plaintiff brought a tort claim alleging emotional distress caused

by the defendant's publication. After reviewing the importance of uninhibited free speech, the Court held that "public figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of [defamatory] publications . . . without showing . . . that the publication contains a false statement of fact which was made with 'actual malice[.]'" *Id.* at 56. The Court noted that imposing the actual-malice requirement on the tort claim was "necessary to give adequate 'breathing space' to the freedoms protected by the First Amendment." *Id.* Following the Supreme Court's lead in *Falwell*, the circuit courts have likewise imposed the actual-malice standard on other tort claims predicated on defamatory speech, recognizing that "a plaintiff may not avoid the protection afforded by the Constitution . . . merely by the use of creative pleading." *Beverly Hills Foodland, Inc. v. United Food and Commercial Workers Union, Local 655*, 39 F.3d 191, 196 (8th Cir. 1994) (noting that the actual-malice standard required for an actionable defamation claim "must equally be met for a tortious interference claim based on the same conduct or statements"). *See, e.g.*, *Jefferson County Sch. Dist. v. Moody's Investor's Services, Corp.*, 175 F.3d 848, 856-58 (10th Cir. 1999) (rejecting plaintiff's tort claims for interference with contractual and business relationships because those claims were based on speech protected by the First Amendment); *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1057-58 (9th Cir. 1990) (acknowledging that the plaintiff's tort claims for product disparagement, trade libel, and tortious interference with business relationships were "subject to the same [F]irst [A]mendment requirements that govern actions for defamation").

Neither the Supreme Court nor any circuit court has applied the actual-malice standard to a breach of contract claim; the only published precedent on this issue comes from a California bankruptcy court. *See County of Orange v. McGraw Hill Companies, Inc.*, 245 B.R. 151, 154-56 (Bankr. C.D. Cal. 1999). But as the district court in the case before us explained, albeit in a footnote:

> [T]he *Cohen* decision depended on the finding that the general law was not being used to "avoid the strict requirements for establishing a libel or defamation claim." On the contrary, in this case, the breach of contract claim is dependent on the truth of the rating and the care taken by the publisher during the publication process, and it is therefore clear to me Compuware is hoping to escape the strict requirement of actual malice in the defamation claim by bringing the contract claim. The language of *Cohen* therefore requires me to apply (not prevents me from applying) First Amendment protections to the contract claim.

We would add that in finding that the protections of the First Amendment were not applicable to the claim in *Cohen*, the Court explicitly noted that Cohen was "not seeking damages for injury to his reputation or his state of mind. He sought damages . . . for breach of a promise that caused him to lose his job and lowered his earning capacity." *Cohen*, 501 U.S. at 671. Here, however, although Compuware amended its complaint to drop its claim for damages and purports to seek only rescission of the contract and return of the sums it paid to Moody's, it is inescapable that Compuware seeks compensation for harm caused to its reputation. The source of this alleged injury is, as the district court pointed out, the content of the rating and the alleged lack of care with which Moody's prepared it, and, although the district court did not explicitly include it, the way in which Moody's exercised its discretion and applied its expertise in arriving at the conclusions contained in the rating.

The facts in the *County of Orange* case are similar to the facts in the present case. There, the plaintiff entered into a written contract with Standard & Poor's ("S & P") — a financial rating company similar to Moody's — under which S & P agreed to provide credit-rating services for the plaintiff. S & P issued a credit rating stating that the plaintiff's financial condition and ability to repay its debt were "fundamentally unsound." The plaintiff alleged that S & P breached its implied duty to perform contractual services in a competent and reasonable manner by inadequately performing the analytical services underlying its ratings. S & P argued that the actual-malice

standard applied to the breach of contract claim because the conduct underlying that claim involved the publication of S & P's credit rating, which is a form of constitutionally protected speech. The court agreed that the actual-malice standard applied to the contract claim, reasoning that the plaintiff could not "avoid the First Amendment by asserting an implied contractual duty to perform the rating function competently." *Id.* at 156.

We conclude that the actual-malice standard applies to the breach of contract claim here. Moody's contracted to publish a credit rating for Compuware, which without question involves activities protected by the First Amendment. Unhappy with the contents of the publication and the corresponding ratings downgrade, Compuware contends that Moody's breached this contract by incompetently compiling, investigating, and evaluating Compuware's credit position, and by publishing an erroneous report. Compuware does not — and cannot — assert that Moody's violated an explicit provision of the contract, arguing instead that Moody's breached an implied contractual covenant to perform skillfully and diligently. While ostensibly presenting a breach of contract claim, this argument is grounded in negligence, and amounts to nothing more than a backdoor attempt to recover damages for the harm allegedly caused by Moody's protected expression of its opinion of Compuware's financial condition. *See Cohen*, 501 U.S. at 671.

Three characteristics of Compuware's breach of contract claim lead us to conclude that we must apply the actual-malice standard to that claim. First, and most importantly, the contract between Compuware and Moody's involves matters central to the First Amendment. The relevant agreement, as best we can determine from the evidence presented by the parties, consists of Moody's promise to provide its opinion of Compuware's creditworthiness and to publish a report of that opinion. Moody's agreed to do no more. Moody's provided that opinion, and Compuware does not claim to the contrary. Both Moody's opinion and its publication are matters protected by the First Amendment; thus the whole of this agreement — the very subject matter and corresponding duties — is intimately tied to speech, expression, and publication. A breach of contract claim based on an agreement to publish an opinion invokes core First Amendment principles, alerting us to the possibility that we may need to apply the actual-malice standard "to give adequate 'breathing space' to the freedoms protected by the First Amendment." *See Falwell*, 485 U.S. at 56.

Second, Compuware does not present a typical contract claim, which challenges the defendant's failure to perform expressly contracted-for duties; instead Compuware asserts an argument sounding in negligence, contending that Moody's did not act skillfully, diligently, or in a workmanlike manner when compiling, investigating, and evaluating its credit report. The scope of the agreement between Compuware and Moody's is extremely narrow. Moody's agreed only to publish *a* credit rating; it did not agree to publish a favorable, thoroughly investigated, or correctly appraised rating. It did not even agree to publish a rating acceptable to Compuware. Thus, in order to pursue its argument that Moody's breached the contract by improperly preparing its publication, Compuware was forced to invoke the duty implied under Michigan law to perform contractual obligations "skillfully, carefully, diligently, and in a workmanlike manner." *Nash v. Sears, Roebuck & Co.*, 174 N.W.2d 818, 821 (Mich. 1970); *Co-Jo, Inc. v. Strand*, 572 N.W.2d 251, 253-54 (Mich. Ct. App. 1997), *superseded by statute on other grounds*, Mich. Court Rules 7.208(I). The Michigan Supreme Court has recognized that this implied contractual duty "is clearly a form of the traditional negligence standard." *Williams v. Polgar*, 215 N.W.2d 149, 156 (Mich. 1974).

Importantly, Compuware argues only that Moody's breached a vague, implied contractual duty to perform competently or in a workmanlike manner; it does not argue that Moody's breached an express contractual obligation by, for example, failing to publish a report at all. Compuware's complete reliance on this negligence and breach-of-implied-duties standard renders its contract claim more akin to a tort claim. *See id.* The Supreme Court and our sister circuits have not hesitated to apply the actual-malice standard to tort claims that are based on the same conduct or statements that underlie a pendant defamation claim. *See, e.g.*, *Falwell*, 485 U.S. at 56; *Beverly Hills Foodland*,

39 F.3d at 196; *Unelko Corp.*, 912 F.2d at 1057-58; *Med. Lab. Mgmt. Consultants v. Am. Broad. Co., Inc.*, 306 F.3d 806, 821 (9th Cir. 2002). We see no material difference between this claim — which, although labeled one for breach of contract, essentially asserts that Moody's acted incompetently (i.e., negligently) in compiling and evaluating its publication of protected expression — and a tort claim based on conduct that might support a pendant defamation claim. *See County of Orange*, 245 B.R. at 156 (recognizing that a plaintiff cannot avoid the actual-malice standard "by asserting an implied contractual duty to perform the rating function competently").

Third, the injury of which Compuware complains is not contractual in nature (i.e., where the plaintiff has not received that for which he bargained); instead, Compuware complains only of an injury to its reputation. Our sister circuits have found that the kind of damages sought by the plaintiff influences whether the actual-malice standard applies to a state-law claim. *See Veilleux v. Nat'l Broad. Co.*, 206 F.3d 92, 127-28 (1st Cir. 2000); *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 522-23 (4th Cir. 1999). In its original complaint, Compuware sought monetary damages for Moody's breach of contract. After Moody's moved to dismiss, Compuware amended its complaint, deleting its claim for compensatory damages and seeking only a rescission of its agreement with Moody's. We question whether this amendment made much of a substantive difference because, as part of its rescission remedy, Compuware sought an order requiring Moody's to repay more than $200,000 in fees paid to it by Compuware. Despite Compuware's attempt to avoid the actual-malice standard by clothing its requested relief in the contractual garb of rescission, we must look beyond the damages sought by the plaintiff to the injuries actually sustained. Having done so, we conclude that, no matter how Compuware frames the harm of which it complains and the relief it seeks, it did not in fact sustain a contractual injury.

Moody's obligations under this contract were basic and simple: Moody's agreed to provide and publish a credit rating for Compuware. Moody's performed its duties when it published its opinion of Compuware's financial condition; Compuware has not been injured by Moody's failure to perform its contractual obligations; and Compuware received all the contractual performance for which it bargained. Compuware's injury derives not from a failure on Moody's part to perform contractual duties but, rather, from Moody's having done what it agreed to do — publish its opinion of Compuware's financial condition. In other words, Compuware was harmed by Moody's opinion, which included negative statements about Compuware. Had Moody's allegedly inadequate preparation and investigation produced a glowingly positive assessment of Compuware's financial situation, Moody's opinion would certainly have been inaccurate, but we suspect that Compuware would not be complaining about the way Moody's arrived at that opinion. The sort of injury at issue in this case — the "defendant made statements that harmed the plaintiff" injury — is a classic example of reputational or defamation-type harm. *See Baggs v. Eagle-Picher Indus., Inc.*, 957 F.2d 268, 273 (6th Cir. 1992) (acknowledging that a statement is defamatory under Michigan law "if it tends . . . to harm the reputation of another"). We thus conclude that, regardless of how Compuware phrases the relief sought, its only injuries are defamation-type harm resulting from Moody's publication of protected speech, and application of the actual-malice standard to Compuware's breach of contract claim is appropriate. *Cf. Cohen*, 501 U.S. at 671 (finding that a plaintiff who asserted a promissory estoppel claim was not attempting to avoid the actual-malice standard because he was "not seeking damages for injury to his reputation or his state of mind"); *Food Lion*, 194 F.3d at 522-24 (4th Cir. 1999) (holding that a plaintiff could not "recover defamation-type damages" from the defendant's publication without satisfying the stricter standards of a defamation claim). At base, the lack of a contractual injury exposes Compuware's claim for what it is: a backdoor attempt to assert a defamation claim without the additional burden of satisfying the demanding actual-malice standard.

Compuware argues here, as it did in the district court, that the Supreme Court's decision in *Cohen*, 501 U.S. at 669-70, prohibits us from applying the actual-malice standard to its breach of contract claim. We find — as the district court did — that *Cohen* actually compels us to apply the

actual-malice standard to the contract claim in this case. While *Cohen* held that a publisher "has no special immunity from the application of general laws," *see id.* at 670, the Court distinguished between cases — like *Cohen* — where a plaintiff is seeking to enforce a generally applicable law and the actual-malice standard does not apply, and cases — like *Falwell* — where a plaintiff is attempting to use a state-law claim "to avoid the strict requirements for establishing a libel or defamation claim" and the actual-malice standard does apply, *id.* at 671. We find that the present case is like *Falwell* in that Compuware is attempting to use its breach of contract claim to avoid the actual-malice standard.

We emphasize the limited nature of the holding in this case. We hold that the actual-malice standard applies to Compuware's breach of contract claim because the contract pertains solely to the publication of protected speech, the claim exclusively relies on arguments grounded in negligence and vague implied contractual duties, and the plaintiff has not suffered a contractual injury but complains only of reputational or defamation-type harm. Obviously, this holding would not apply to any breach of contract claim where the relevant agreement called for the parties to do something other than publish protected expression. Neither would this holding apply if Compuware alleged that Moody's breached the express terms of the contract by, for example, failing to provide a rating at all. But to allow this claim on these facts to proceed without the protection of the actual-malice standard, would be to suffocate free speech principles by cutting off the "breathing space" required by the First Amendment. *See Falwell*, 485 U.S. at 56.

The dissent believes that our holding invalidates many "perfectly legitimate contracts" and infringes upon a party's freedom to contract for a positive result or opinion. We emphasize that this case does not involve (and thus our holding does not affect) a party's right to agree to, or to sue for the breach of, an express contractual provision. The dissent discusses examples in which a party contracts for a positive result (e.g., where a public figure contracts for a radio announcer to "say nice things about [his] automobile business"). The present case, however, does not involve a contract for a positive result: Compuware contracted only for a credit rating, not a favorable credit rating. Had Moody's agreed to provide a favorable rating, then Compuware could have brought suit for the breach of that express contractual provision and, presumably, the actual malice standard would not apply. But those are not the facts before this court. Therefore, contrary to the dissent's belief, our holding does not limit a party's right to contract for a positive (or specific) result, and, in instances where a party has contracted for such a result (even if it uses terms sounding in tort law) and sues for a breach of that express provision, our holding does not require application of the actual malice standard.

## V. Remaining Arguments

Compuware presents a final set of arguments, none of which requires a reversal of the district court's decision. Compuware first argues that because the district court limited the parties' summary judgment motions to the issue of actual malice, the court erred in alternatively holding that Moody's was not negligent. Our conclusions that the district court did not err in applying the actual-malice standard to both claims and that Compuware cannot show actual malice render this argument moot.

Compuware also contends that it did not have an adequate opportunity to develop the evidence supporting its breach of contract claim and that we should remand for further proceedings on that claim. While we agree that the district court narrowly confined the summary judgment motions to the issue of actual malice, thus depriving Compuware of the opportunity to introduce certain evidence in support of its contract claim, we conclude that, regardless of the evidence Compuware might produce, it cannot succeed without a showing of actual malice on *the contract claim alleged in its amended complaint*. Compuware's amended complaint alleges a breach of contract claim based solely on Moody's agreement to publish a ratings report and Compuware's belief that Moody's breached its implied contractual duty to perform in a workmanlike manner.

Because this sort of contract claim requires a showing of actual malice, and because we have already found that Compuware cannot establish actual malice, we conclude that Compuware cannot succeed on the contract claim alleged in its complaint.

## VI. Conclusion

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

_____

## CONCURRING IN PART, DISSENTING IN PART

_____

ROGERS, Circuit Judge, concurring in part and dissenting in part. The extension of First Amendment tort law principles to contract cases is unwarranted and entirely unprecedented, except for a lone bankruptcy court case. Therefore, while I agree with the judgment of the majority regarding Compuware's defamation claim, I dissent from the majority's conclusion that the First Amendment requires a showing of malice in order for Compuware to assert a common law breach-of-contract claim against Moody's.

Tort law and contract law are fundamentally different in ways that prevent the imposition of First Amendment principles fashioned for tort law to cases sounding in contract. Tort law is effective government regulation in a way that contract law is not. Therefore limits on government power (here the First Amendment) are more appropriately applied in tort cases. Contract law in contrast at its essence enforces *agreements*; that is its fundamental distinction from tort law. *E.g.*, E. Allan Farnsworth, 1 FARNSWORTH ON CONTRACTS §1.1 ("the law of contracts is confined to promises"); Uniform Commercial Code §1-201(11) (a contract "results from the parties' agreement").[1]

Contracts can commit parties to take action even though the government may not be able to command the identical action because of constitutional limits on government power. Stated differently, constitutional freedoms can be contracted away in ways that the government cannot simply take them away. By entering into an employment contract, for instance, one can contract away the right to read the paper in the morning (by taking work as a morning watchman), or the right to solicit for a political party (by agreeing to be a judge). The Supreme Court only recently emphasized the ability of private schools to contract away speech freedoms in order to participate in an athletic league. *See Tenn. Secondary Sch. Athletic Ass'n v. Brentwood Acad.*, - - S. Ct. - -, 2007 WL 1773196, at *6 (June 21, 2007). In the context of the present case, in particular, one can contract to say good (or accurate) (or well-researched) things about the entity one contracts with.

Requiring a showing of actual malice to prevail on a contract claim, however, effectively destroys the ability of public figures to make this last type of contract. The malice requirement does so by inserting into each such contract the right to violate the contractual obligation as long as there is no malice.

What if public figure Doe pays a radio station to have its announcer say nice things about Doe's automobile business? The announcer—through negligence, or incompetence (or honesty)—says Doe's cars "don't last long" instead of "don't waste gas." If malice is required for contract recovery, Doe does not even get his money back. That result cannot be constitutionally imposed, and it is hard to imagine that the Supreme Court would so hold. Yet this example fits into each of the factors listed by the majority as a limitation on its holding. Radio announcing is at the heart of protected speech, the contract action may be "grounded in negligence," and the harm is reputational. (Although in response to this example the majority would limit its holding to contracts

_____

[1]The introductory chapter of Professor Farnsworth's treatise summarizes the value of freedom of contract:

> From a utilitarian point of view, freedom to contract maximizes the welfare of the parties and therefore the good of society. From a libertarian point of view, it accords to individuals a sphere of influence in which they can act freely.

Farnsworth, *supra*, §1.7 at 23.

that do not require a specific result, it is not clear why the First Amendment should permit parties to require by contract that a particular result be reported, but to deprive parties of the ability to contract that a certain standard of care be exercised in making an investigation leading to a report. Freedom of contract is involved either way, and speech freedoms would seem restricted, if at all, more in the former than in the latter case.)

The fact that a contract requires "reasonable care" does not mean that a claim for breach of contract is the equivalent of a tort claim for negligence. The difference is the source of the obligation. In tort cases the obligation comes from a duty imposed by the government to act reasonably on pain of paying the costs of acting unreasonably. In contract cases the obligation comes from a voluntarily entered-into undertaking. The difference is important because a tort standard of care imposed by the government impinges on individual freedoms in a way that fairly directly implicates freedoms protected by the Bill of Rights. A contractual standard of care does not do so: one could contract to exercise any of various levels of care, not just the maximum that the government could impose under tort law. The standard of care contracted for may be higher than that imposed by tort law in the absence of contract. Contracting parties should not be precluded from entering into such contracts merely because the obligation is stated in terms that the tort law also uses.

This idea is reflected in *Cohen v Cowles Media Co.*, 501 U.S. 663 (1991), in which the Supreme Court held that the First Amendment did not preclude the plaintiff's promissory estoppel claim where a reporter revealed the plaintiff's identity despite a promise not to do so. Just as Minnesota law in *Cohen* could require the reporter to keep his promise to keep Cohen's identity a secret (though without the promise the First Amendment might not permit state sanction of the disclosure), Michigan law can require Moody's to comply with its contractual promises to act carefully (though without the promises the First Amendment does not permit state sanction for false or misleading credit ratings, absent malice). "The parties themselves . . . determine the scope of their legal obligations, and any restrictions that may be placed on the publication of truthful information are self-imposed." *Cohen*, 501 U.S. at 671. The idea is also consistent with *Snepp v. United States*, 444 U.S. 507 (1980), which held that an agreement by a former CIA employee not to publish information about the agency without prior clearance was enforceable, and which reasoned in part:

> When Snepp accepted employment with the CIA, he voluntarily signed the agreement that expressly obligated him to submit any proposed publication for prior review. He does not claim that he executed this agreement under duress. Indeed, he voluntarily reaffirmed his obligation when he left the Agency.

444 U.S. at 510.

Nor does the reputational aspect of the contract damages justify extending the malice requirement to contract actions. Contracts may, after all, be intended to obtain a better reputation. One need only think of advertising contracts or client contracts entered into by public relations firms. Breach of such contracts may result in expectable reputational injury. There is no principled reason to deny recovery for such contract loss  just because a noncontracting party, say an investigative news reporter, would not be liable for the same injury. In any event, in the instant case Compuware is not seeking damages for injury to its reputation, but seeks a rescission remedy and repayment of the contract price. That Compuware would be unlikely to sue in the face of a positive rating is beside the point when the question is the care with which Moody's acted in performing a task it was paid to perform.

It is true that credit rating providers may be analogized to news reporters, whom we think of as acting at the core of First Amendment protection. But requiring malice to recover for breach

of contract in this case elevates the protection Moody's enjoys against breach of contract claims above what other contracting parties in the state of Michigan would enjoy. The fact that Moody's is in the business of publishing does not eliminate any and all contractual obligations the company has towards those paying real money for its services. Under the majority's reasoning, Moody's is free to assign ratings based solely on any nonmalicious basis, and a customer would have no recourse against the company at all. Such freedom from contractual obligation is not provided generally to contracting parties. Moody's and other credit rating agencies, on the other hand, can protect themselves from implied contractual obligations by expressly outlining their obligations when dealing with the companies they contract with.

It is also true that Moody's relies on the implied term of the contract, imposed by state law, that the contract be performed in a skillful and workmanlike manner. *Nash v. Sears, Roebuck & Co.*, 174 N.W.2d 818, 821 (Mich. 1970). But for constitutional purposes this does not distinguish the case from any other contract action. The obligation is still and all taken entirely voluntarily. The parties could have explicitly contracted away that implied term, and of course the parties could have refrained from entering into the contract in the first place, knowing the implied term that state law puts into the contract.

At bottom, the majority's underlying concern may be that Compuware contracted for no more than what it got. The record does indicate that Moody's acted in conformance with its duties under the contract in preparing its rating. Moody's analysts appear to have done what they were paid to do in taking all available information and analyzing the business and economic environment in which Compuware was operating. It is not incumbent upon a credit rating agency simply to take a client's word for it when the client maintains that all is well in its business when ample evidence establishes otherwise. But that is not the basis for the district court's summary judgment, and Compuware was not given the chance to respond to this argument below. The district court's order to the parties was to brief the issue of actual malice and the order otherwise gave no indication that a lower standard could be applied to the breach of contract action. While ultimate relief against Moody's appears unlikely, we are not in a position at this point to affirm on an alternative ground.

We should not throw out a weak contract case by means of a newly created legal doctrine that effectively makes unenforceable a wide swath of perfectly legitimate contracts. For these reasons I respectfully dissent from Parts IV, V, and VI of the majority opinion. I would reverse and remand the dismissal of the contract claim. I concur in Parts I, II, and III of the majority opinion.