SMITH v CALVARY CHRISTIAN CHURCH

Docket No. 114287. Argued May 3, 2000 (Calendar No. 1). Decided
July 25, 2000.

David O. Smith brought an action in the Oakland Circuit Court against
the Calvary Christian Church and its pastor, asserting that certain
personal information he had revealed to the pastor in confidence
had been disclosed by the pastor in violation of MCL 600.2156;
MSA 27A.2156. He further claimed breach of contract, and sought
damages for invasion of privacy and the intentional infliction of
emotional distress. Following a hearing, the court, Steven N.
Andrews, J., granted summary disposition for the defendants. The
Court of Appeals, JANSEN, P.J., and MARKEY, J. (O'CONNELL, J., dissent-
ing), affirmed the grant of summary disposition with regard to the
plaintiff's statutory and contract claims, but remanded the tort
issues to the trial court for a determination of whether the plaintiff
was a member of the church at the time of the pastor's disclosure.
233 Mich App 96 (1998) (Docket No. 204661). The defendants
appeal.

In an opinion by Justice CAVANAGH, joined by Justices KELLY,
TAYLOR, CORRIGAN, YOUNG, and MARKMAN, the Supreme Court *held*:

Because the plaintiff had consented to the church's practices,
and manifested his continuing consent by remaining actively
engaged with the church, his intentional tort claims against the
defendants fail as a matter of tort law. Because tort law disposes of
the plaintiff's claims, the constitutional defenses the defendants
presented need not be considered.

The plaintiff manifested his consent to the church's practices by
becoming actively engaged in the church and explicitly consenting
in writing to obey its law and to accept its discipline. Even after
the plaintiff resigned his formal church membership, he remained
actively engaged in the church and was present and participating in
a doctrinal dispute in the church on the day he was marked. Con-
sent is the relevant consideration. Under tort law principles, a per-
son who consents to another's conduct cannot bring a tort claim
for the harm that follows from that conduct. Without a wrong,
there is no compensable claim.

Justice Weaver, concurring in the result, stated that discussion of constitutional defenses is unnecessary to the resolution of this case. As to the plaintiff's claim of intentional infliction of emotional distress, the tort has not been recognized or adopted by the Supreme Court, and is not adopted in this case. Finally, summary disposition for the defendant was appropriate pursuant to MCR 2.116(C)(10) on his invasion of privacy claim.

Reversed.

*William S. Stern* for plaintiff-appellee.

*Bigler, Berry, Johnston, Sztykiel & Hunt, P.C.* (by *Witold Sztykiel, Steven C. Berry,* and *Mary Jo Boerman*), for defendants-appellants.

Cavanagh, J. In this case, we are asked to decide whether plaintiff's intentional tort claims arising from church discipline are barred by the religion clauses of the federal constitution. Even if those constitutional provisions do not provide any defense to plaintiff's claims, however, plaintiff cannot prevail in this action. Through his words and deeds, plaintiff consented to the religious discipline imposed on him, so his claims fail as a matter of tort law. Accordingly, we reverse the judgment of the Court of Appeals, and reinstate the trial court's grant of summary disposition under MCR 2.116(C)(10) for the defendants.

I

Plaintiff began attending Calvary Christian Church, a small, independent church, in August 1985. He formally became a church member in early 1986. When he became a member, plaintiff specifically consented not to cause division within the church, to be faithful

to Matthew 18:15-17,[1] and to accept discipline imposed by the church.

Shortly after he began to attend the church, plaintiff requested a meeting with the church's pastor, Mark Byers. At that meeting, plaintiff disclosed that he previously had frequented prostitutes. Plaintiff apparently believed that this disclosure would be kept confidential.

Later, in 1991, plaintiff was formally removed from the church's membership. He was removed not because of his disclosure, but rather because he was causing division within the church by challenging church leaders over religious doctrine. Plaintiff requested that he be reinstated, but the pastor advised that before plaintiff could be reinstated, he had to confess his sins, including his past indiscretions with prostitutes, to the church board and to plaintiff's wife. Plaintiff complied and was reinstated, but the board warned him that if he did not end his divisive conduct, he would again be subject to discipline.

Despite this warning, plaintiff continued to cause division within the church. Therefore, the church decided to "mark" plaintiff according to Matthew

---

[1] This passage provides:

> Moreover if thy brother shall trespass against thee, go and tell him his fault between thee and him alone; if he shall hear thee, thou has gained thy brother.
>
> But if he will not hear *thee*, *then* take with thee one or two more, that in the mouth of two or three witnesses every word may be established.
>
> And if he shall neglect to hear them, tell *it* unto the church; but if he neglect to hear the church, let him be unto thee as an heathen man and a publican. [*The Holy Bible*, Matthew 18:15-17 (King James Version).]

18:15-17, which involves singling out a person who is involved in sin and causing division within the church, and detailing the person's sins before the church congregation. The pastor advised plaintiff's wife and family that plaintiff would be marked on December 8, 1996, and cautioned them against attending services that day. By that time, plaintiff had submitted a letter withdrawing his formal membership in the church; however, he remained involved with the church, and was present at the church on the day chosen for his marking, apparently entering the church to dispute the pastor over religious doctrine. Later in the service, the pastor announced to the congregation that plaintiff had formerly visited prostitutes.

On the basis of this revelation, plaintiff filed suit, alleging several causes of action. First, he asserted that his disclosure was confidential, and that the pastor repeating it to the congregation violated MCL 600.2156; MSA 27A.2156.[2] He further asserted claims for breach of contract, invasion of privacy, and intentional infliction of emotional distress, and contended that the disclosure was not motivated by religious doctrine, but by the pastor's personal spite and his intent to humiliate plaintiff and cause dissension in his family.

---

[2] This section is in chapter 21 of the Revised Judicature Act, which concerns evidence. The section provides:

No minister of the gospel, or priest of any denomination whatsoever, or duly accredited Christian Science practitioner, shall be allowed to disclose any confessions made to him in his professional character, in the course of discipline enjoined by the rules or practice of such denomination.

After a hearing, the trial court granted summary disposition for the defendants on all counts.[3] The court held that the statute was a rule of evidence and did not create a cause of action for the disclosure of private or privileged communications. It also held that plaintiff could not prove the elements of a breach of contract because there was no agreement that plaintiff's disclosure would be kept confidential. Finally, the trial court held that plaintiff had not adequately pleaded his tort claims, but added that even if he had, whether clergy must keep confidential a personal disclosure is a matter of religious doctrine that a civil court cannot decide.

The Court of Appeals affirmed on the statutory and contract claims, but reversed and remanded the tort claims. After reviewing cases discussing the First Amendment Free Exercise Clause in the context of religious discipline, doctrine, and polity, the Court remanded for a determination of whether plaintiff was a member of the church when he was marked. The Court reasoned that if plaintiff was a member, then judicial examination of the marking process would be barred by the Free Exercise Clause; however, if he was not a member, the Court reasoned that the church would have had no power to discipline plaintiff, and his tort claims may have been viable. 233 Mich App 96; 592 NW2d 713 (1998). Defendant appealed the remand order, and this Court granted leave. 461 Mich 947 (2000).

II

Throughout this case, the defendants have argued that plaintiff's claims are barred by the First Amend-

---

[3] Plaintiff named both the church itself and the pastor individually as defendants.

ment religion clauses.[4] Briefly, the defendants' first argument is that this Court cannot decide plaintiff's claims without deciding matters of defendants' religious doctrine. Under the ecclesiastical abstention doctrine, apparently derived from both First Amendment religion clauses,[5] "civil courts may not redetermine the correctness of an interpretation of canonical text or some decision relating to government of the religious polity." *Paul v Watchtower Bible & Tract Society,* 819 F2d 875, 878, n 1 (CA 9, 1987). See also *Watson v Jones,* 80 US (13 Wall) 679, 729; 20 L Ed 666 (1871) (an ecclesiastical body's "decisions should be binding in all cases of ecclesiastical cognizance"); *Serbian Eastern Orthodox Diocese v Milivojevich,* 426 US 696, 709; 96 S Ct 2372; 49 L Ed 2d 151 (1976) (when disputes require inquiry into religious law and polity, civil courts shall not disturb the ecclesiastical body's decision); *Berry v Bruce,* 317 Mich 490, 499; 27 NW2d 67 (1947). Second, defendants argue that under the Free Exercise Clause, this Court cannot impose liability on them unless their actions in this case posed a threat to the public safety, peace, or order. See *Sher-*

---

[4] The religion clauses of the First Amendment state:

    Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . . [US Const, Am I.]

These provisions apply to the states through the Fourteenth Amendment. *Cantwell v Connecticut,* 310 US 296, 303; 60 S Ct 900; 84 L Ed 1213 (1940).

[5] The United States Supreme Court has not stated whether this doctrine is derived from the Establishment Clause or the Free Exercise Clause, but has simply spoken in terms of the First Amendment. See *Serbian Eastern Orthodox Diocese v Milivojevich,* 426 US 696, 708-720; 96 S Ct 2372; 49 L Ed 2d 151 (1976). Perhaps this is because the doctrine has roots in both clauses; declaring a religious decision's correctness would simultaneously establish that decision and inhibit the free exercise of an opposing belief. See 5 Nowak & Rotunda, Constitutional Law (3d ed), § 21.12, p 572.

*bert v Verner*, 374 US 398, 402-403; 83 S Ct 1790; 10 L Ed 2d 965 (1963). Accordingly, defendants argue that their actions did not pose such a threat.

Plaintiff, of course, disputes these defenses. He argues that his claims do not involve any question of religious polity or doctrine, avoiding the ecclesiastical abstention doctrine. Further, he argues that because Michigan tort law is valid, neutral, and of general applicability, defendants do not have a free exercise defense. See *Employment Div, Oregon Dep't of Human Resources v Smith*, 494 US 872, 879; 110 S Ct 1595; 108 L Ed 2d 876 (1990).

A

Although these competing claims present interesting and complex constitutional issues, we do not believe that resolving them is necessary to decide this case. Instead, we can simply assume without deciding that plaintiff is correct that these constitutional defenses do not apply. Similarly, because the defendants expressly waived any reliance on the Michigan Constitution,[6] we need not decide whether its protections of religious freedom offer the defendants any shelter. Under the assumption that no constitutional defenses apply, plaintiff's claims fail as a matter of tort law.

B

Plaintiff alleges that the defendants committed the torts of invasion of privacy and intentional infliction of emotional distress. However, the extent of plain-

---

[6] Const 1963, art 1, § 4  provides protections for religious freedom.

tiff's actions do not leave a genuine issue of material fact whether he consented to the defendants' allegedly tortious acts. Because plaintiff had consented to the church's practices, his claims fail as a matter of law and defendants are entitled to judgment under MCR 2.116(C)(10).[7]

Plaintiff manifested his consent to the church's practices in several ways. First, he became actively engaged in the church in 1985, and shortly after, he explicitly consented in writing to obey the church's law, and to accept the church's discipline "with a free, humble, and thankful heart." Thus, plaintiff can be taken to have impliedly consented by his active engagement and participation in the church, or to have expressly consented through his writing. 4 Restatement Torts, 2d, § 892, p 362. Any doubt whether plaintiff appreciated the scope of his consent by his active engagement is certainly resolved by the explicit writing. Further, as the Supreme Court stated over 130 years ago, "[a]ll who unite themselves to such a body do so with an implied consent to this [church] government, and are bound to submit to it." *Watson, supra* at 729.

However, plaintiff argues, relying on the Oklahoma court's decision in *Guinn v Church of Christ*, 775 P2d 766 (Okla, 1989), that he revoked consent when he resigned his church membership. In *Guinn*, the plaintiff's perceived misdeeds subjected her to the same marking process as the instant plaintiff. She resigned her church membership and disassociated herself from the church, but the church marked her anyway.

---

[7] We have not been asked to, and do not, consider whether the tort of intentional infliction of emotional distress exists in Michigan. In this case, plaintiff cannot prevail regardless of the tort's existence.

Considering her intentional infliction of emotional distress claim, the *Guinn* court held that when a church member "removed herself from membership, [she] withdrew her consent, depriving the Church of the power actively to monitor her spiritual life through overt disciplinary acts." *Id.* at 779. The instant plaintiff claims that because he too revoked his membership in the defendant church, he revoked his consent to the defendants' practices.

We disagree with plaintiff's argument because church membership alone is not dispositive of whether plaintiff consented to the church's practices. For example, a person may be a full participant in a church, fully aware of and actively engaged in all of its practices, without ever having become a formal church member. Through knowledge and actions, a person so engaged with the church would indicate consent to the church's practices although the person never became a church "member." Further, "membership" is an amorphous concept.[8] Indeed, many faiths do not include a concept of "membership" at all, and do not require membership for adherents to participate in the faith's formalities and customs.[9] Therefore, we reject the proposition that whether a person is a

---

[8] See Bradley, *Churches and Church Membership in the United States 1990* (Atlanta: Glenmary Research Center, 1990), p xiv.  The authors list defining membership as the most critical methodological problem in calculating church membership. They also note that persons associated with churches could be classified as regular church members with full membership status, regular participants in churches who partake in all of the churches' formalities and custom yet are not members with full membership status, or simple adherents to the church's religious beliefs. An additional problem is that "membership" has varying meanings for different faiths. See, e.g., 12 *New Catholic Encyclopedia*, p 997  (describing the different levels of membership in the Catholic Church).

[9] See, generally, Eliade, *Rites and Symbols of Initiation* (New York: Harper & Row, 1965), p ix.

member of the church or religious organization that allegedly invaded the person's rights is alone determinative of whether the person may bring an intentional tort claim against the alleged tortfeasor.

Instead, consent is the relevant consideration.[10] As discussed, plaintiff consented to the church's practices, and specifically consented to accept discipline. His claim that he revoked consent by terminating membership is belied by his continued involvement with the church. Even after the plaintiff resigned his formal church membership, he remained actively engaged in the church. Particularly, he was present and participating in a doctrinal dispute in the church on the day he was marked. In the same vein, plaintiff is in a different position than the plaintiff in *Guinn*. There, the plaintiff not only resigned her church membership, but she "expressed no interest in continuing her association with the [church]." Further, she "posed no threat of continued adverse influence on any [church] congregation." *Id.* at 782. Although the instant plaintiff did resign his formal church membership, he continued an active association with the church, and specifically attempted to influence the church's congregation, even on the very day he was being marked.[11]

---

[10] See, e.g., Zollman, American Church Law, § 328, p 312 ("It is perfectly clear that, whatever church relationship is maintained in the United States, is not a matter of status. It is based . . . on voluntary consent").

[11] We recognize, but need not decide, another issue in this case. That issue is whether religious discipline imposed on a person who is not a member of the disciplining religious body, or who is not consenting to the body's authority when the discipline is imposed, nevertheless arose out of events that occurred during the person's period of membership or consent. Allowing a person who was a member of a religious body or consented to such a body's practices to escape discipline for actions that occurred during the period of membership or consent by severing ties to

Under tort law principles, a person who consents to another's conduct cannot bring a tort claim for the harm that follows from that conduct. Restatement, § 892A(1). This is because no wrong is done to one who consents. *Id.*, comment a. Without a wrong, plaintiff has no compensable claim. Had the church taken its action toward a person more comparable to the plaintiff in *Guinn*, a more difficult question would be presented. Similarly, a more difficult question would be presented if the circumstances of the discipline were different, for example, if the discipline was in violation of the Michigan Penal Code. However, because plaintiff consented to the church's practices, and his active engagement with the church indicated his continuing consent, the church's actions disciplining plaintiff were not tortious.

III

In conclusion, we hold that because reasonable minds cannot disagree that plaintiff consented to the church's practices, and manifested his continuing consent by remaining actively engaged with the church, his intentional tort claims against the defendants fail as a matter of tort law. Because tort law disposes of the plaintiff's claims, we need not consider the constitutional defenses the defendants presented. The judgment of the Court of Appeals is reversed, and summary disposition for the defendants is reinstated.

KELLY, TAYLOR, CORRIGAN, YOUNG, and MARKMAN, JJ., concurred with CAVANAGH, J.

---

that body could undermine the efficacy of the body's disciplinary practices toward its remaining members.

Weaver, C.J. I concur in the result of the majority opinion. I write separately to state that I do not join the majority's constitutional discussion in part II because it is unnecessary to the resolution of this case. See *ante*, pp 683-685. As to the plaintiff's tort claim of intentional infliction of emotional distress, I note that this Court has not recognized or adopted that tort, see *Roberts v Auto-Owners Ins Co*, 422 Mich 594; 374 NW2d 905 (1985), and does not do so here. See *ante*, p 686, n 7. Finally as to plaintiff's invasion of privacy claim, I agree that summary disposition for the defendant was appropriate pursuant to MCR 2.116(C)(10) (no genuine issue of material fact).