*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

---

HOLY TRINITY ROMANIAN ORTHODOX
MONASTERY and ADRIAN M. LUPU-LEICA,

        Plaintiffs-Appellees,

v

ROMANIAN ORTHODOX EPISCOPATE OF
AMERICA,

        Defendant-Appellant.

UNPUBLISHED
March 19, 2019

No. 342844
Washtenaw Circuit Court
LC No. 17-000876-CB

---

ROMANIAN ORTHODOX EPISCOPATE OF
AMERICA,

        Plaintiff-Appellant,

and

WILLIAM G. POPP, also known as NATHANIAL
POPP, and BISHOP OF THE ROMANIAN
ORTHODOX EPISCOPATE OF AMERICA,

        Plaintiffs,

v

HOLY ASCENSION ORTHODOX CHRISTIAN
MONASTERY, HOLY TRINITY ROMANIAN
ORTHODOX MONASTERY, ADRIAN LUPU-
LEICA, DORIAN CONTY, SEBASTIAN
STEFAN DUMITRASCU, and IOAN IRINEU
DUVLEA,

        Defendants-Appellees.

No. 342846
Washtenaw Circuit Court
LC No. 17-000904-CB

---

Before:  SAWYER, P.J., and CAVANAGH and K. F. KELLY, JJ.

PER CURIAM.

In this consolidated appeal, the Romanian Orthodox Episcopate of America (ROEA), a diocese of the Orthodox Church in America, appeals as of right the trial court's order granting appellees Holy Trinity Romanian Orthodox Monastery and Adrian Leica's motion for declaratory judgment and quiet title.  We reverse and remand.

The ROEA created the Holy Ascension Romanian Orthodox Christian Monastery, a Michigan nonprofit corporation during 2001.  The ROEA's Archbishop Nathanial Popp invited then Bishop Ioan Duvlea and the Reverend Father Sebastian Dumitrascu from Romania to come to America to serve the Romanian immigrant community.  Duvlea served as the monastery's abbot.  During 2011, Leica conveyed two parcels of real property located at 15143 Sheridan Rd., Clinton, Michigan, in Washtenaw County to the monastery.  Later, the ROEA and the Orthodox Church in America investigated allegations of misconduct by Duvlea.  During 2015, Duvlea, Dumitrascu, and others on the board of trustees of Holy Ascension amended the monastery's articles of incorporation and bylaws.  The ROEA prepared a memorandum regarding the ROEA's ownership interest in the real property located at 15143 Sheridan Rd. and recorded the memorandum on November 8, 2016, in the Washtenaw County Register of Deeds.

The ROEA and the Orthodox Church in America held a trial of Duvlea that resulted in Duvlea's suspension and demotion to the status of a lay monk.  During July 2017, Duvlea, Dumitrascu, and others on Holy Ascension's board of trustees conveyed the real property located at 15143 Sheridan Rd. by quitclaim deed to Holy Trinity, a Michigan nonprofit corporation they created, and they dissolved Holy Ascension without the knowledge of the ROEA and the Orthodox Church in America.  On September 6, 2017, Holy Trinity and Leica sued the ROEA for declaratory judgment and to quiet title to the disputed property.  On September 12, the ROEA and Popp sued Leica, Dorian Conty, Dumitrascu, Duvlea, Holy Trinity, and Holy Ascension for declaratory judgment, quiet title, and slander of title.  Holy Trinity and Leica moved for declaratory judgment, and the trial court ruled in their favor.  The ROEA now appeals.

This case requires determination whether Holy Trinity, a monastic corporate entity formed by a schismatic faction that left the ROEA, could claim ownership of the property that the faction conveyed from Holy Ascension before dissolving it.  The ROEA contends that Holy Ascension owned but held in trust for the ROEA, a hierarchical church, the disputed property pursuant to church documents governing the ecclesiastical structure, polity, rules, discipline, and usage of the church with which Holy Ascension affiliated itself and to which it submitted.  The ROEA argues that the organization, structure, and administration of Holy Ascension by the denomination determines the ownership and control of the disputed property in this case.  It asserts that the trial court erred by not applying the ecclesiastical abstention doctrine and that the trial court should have deferred to the ROEA's hierarchical authority and its decisions regarding the ownership of the disputed property.  We agree.

We review "de novo a decision to grant or deny a declaratory judgment; however, the trial court's factual findings will not be overturned unless they are clearly erroneous." *Ter Beek v Wyoming*, 297 Mich App 446, 452; 823 NW2d 864 (2012).  Findings of fact are clearly

erroneous where no evidentiary support exists or if this Court is left with a definite and firm conviction that a mistake has been made. *Trahey v Inkster*, 311 Mich App 582, 593; 876 NW2d 582 (2015). A quiet title action is equitable in nature. *Canjar v Cole*, 283 Mich App 723, 727; 770 NW2d 449 (2009). We review de novo a trial court's quiet title decision. *Beach v Lima Twp*, 489 Mich 99, 106; 802 NW2d 1 (2011). We also review de novo a trial court's interpretation of corporate bylaws. *Slatterly v Malidol*, 257 Mich App 242, 250-251; 668 NW2d 154 (2003).

The United States Supreme Court, the Michigan Supreme Court, and this Court have established principles for addressing property disputes like the one in this case. In *Winkler by Winkler v Marist Fathers of Detroit, Inc*, 500 Mich 327, 337 n 4; 901 NW2d 566 (2017), the Michigan Supreme Court explained:

> The First Amendment provides, in part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." US Const, Am I. "These provisions apply to the states through the Fourteenth Amendment." *Smith v Calvary Christian Church*, 462 Mich 679, 684 n 4, 614 NW2d 590 (2000). They do not, however, "dictate that a State must follow a particular method" when applying the ecclesiastical abstention doctrine to disputes brought in its civil courts, so long as the method does not require from those courts "consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." *Jones v Wolf*, 443 US 595, 602; 99 S Ct 3020; 61 L Ed 2d 775 (1979) (quotation marks and citation omitted).

> The Michigan Constitution also contains its own guarantee of religious freedom, see Const 1963, art 1, § 4, which "is at least as protective of religious liberty as the United States Constitution." *People v DeJonge (After Remand)*, 442 Mich 266, 273 n 9; 501 NW2d 127 (1993).

The Michigan Supreme Court clarified further:

> The ecclesiastical abstention doctrine arises from the Religion Clauses of the First Amendment of the United States Constitution and reflects this Court's longstanding recognition that it would be inconsistent with complete and untrammeled religious liberty for civil courts to enter into a consideration of church doctrine or church discipline, to inquire into the regularity of the proceedings of church tribunals having cognizance of such matters, or to determine whether a resolution was passed in accordance with the canon law of the church, except insofar as it may be necessary to do so, in determining whether or not it was the church that acted therein. Accordingly, we have consistently held that the court may not substitute its opinion in lieu of that of the authorized tribunals of the church in ecclesiastical matters, and that judicial interference in the purely ecclesiastical affairs of religious organizations is improper.

> The doctrine thus operates to ensure that, in adjudicating a particular case, a civil court does not infringe the religious freedoms and protections guaranteed under the First Amendment. It does not, however, purport to deprive civil courts

of the right . . . to exercise judicial power over any given class of cases. The doctrine, for instance, has frequently been invoked and applied in the adjudication of disputes over church property; it has not, however, been understood to categorically preclude a civil court from assuming jurisdiction over such disputes. Likewise, while the doctrine calls for deference to the decisions of the authorized tribunals of [a religious entity] in ecclesiastical matters, that deference simply requires civil courts to accept such decisions as final, and as binding on them, in their application to the case before them.

\* \* \*

Whether a claim sounds in property, tort, or tax, for instance, is not dispositive. Nor is the fact that the claim is brought against a religious entity, or simply appears to be the sort that likely involves its ecclesiastical policies. What matters instead is whether the actual adjudication of a particular legal claim would require the resolution of ecclesiastical questions; if so, the court must abstain from resolving those questions itself, defer to the religious entity's resolution of such questions, and adjudicate the claim accordingly. The doctrine, in short, requires a case-specific inquiry that informs how a court must adjudicate certain claims within its subject matter jurisdiction[.] [*Id*. at 337-341 (quotation marks and citations omitted).]

\* \* \*

It is for the circuit court, in the first instance, to determine whether and to what extent the adjudication of the legal and factual issues presented by the plaintiff's claim would require the resolution of ecclesiastical questions (and thus deference to any answers the church has provided to those questions). [*Id*. at 343.]

In *Chabad-Lubavitch of Mich v Schuchman*, 305 Mich App 337, 350-353; 853 NW2d 390 (2014), rev in part on other grounds 497 Mich 1021 (2015), this Court explained when circuit courts should apply the "neutral principles of law" approach and when they should apply the ecclesiastical abstention doctrine:

[T]he approach to a civil court's resolution of a dispute over church property turns on which of three "general headings" apply. *Bennison* [*v Sharp*], 121 Mich App [705,] 713-714, 329 NW2d 466 [(1982)]. The first class is "where property is purchased for the use of a religious congregation, 'so long as any existing religious congregation can be ascertained to be that congregation or its regular and legitimate successor, it is entitled to the use of the property'." *Id*. at 714, quoting *Watson*, 80 US [(13 Wall) 679, 726; 20 L Ed 2d 666 (1871)]. The second class is that in which property is held by a congregation that, " 'by nature of its organization, is strictly independent of other ecclesiastical associations' " and " 'owes no fealty or obligation to any higher authority.' " *Bennison*, 121 Mich App at 714, quoting *Watson*, 80 US at 722. If the second class applies, the dispute is governed " 'by the ordinary principles which govern voluntary associations[.]' " *Bennison*, 121 Mich App at 714, quoting *Watson*, 80 US at 726. The third class

-4-

involves a situation in which the property is held by "a religious congregation or ecclesiastical body which 'is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete in some supreme judicatory over the whole membership of that general organization.' " *Bennison*, 121 Mich App at 714, quoting *Watson*, 80 US at 722-723. This third class describes hierarchical denominations. See *Lamont Community Church v Lamont Christian Reformed Church*, 285 Mich App 602, 617-620; 777 NW2d 15 (2009). "The determination of whether a denomination is hierarchical is a factual question." *Id*. at 615.

If a religious denomination is hierarchical, the ecclesiastical abstention doctrine applies. *Id*. at 616. Under this doctrine, "civil courts may not redetermine the correctness of an interpretation of canonical text or some decision relating to government of the religious polity." *Smith v Calvary Christian Church*, 462 Mich 679, 684; 614 NW2d 590 (2000) (quotation marks and citation omitted). Instead, courts must "defer to the resolution of those issues 'by the highest court of a hierarchical church organization.' " *Lamont Community Church*, 285 Mich App at 616, quoting *Bennison*, 121 Mich App at 713. Thus, when a denomination is hierarchical, trial courts must enter a judgment that is consistent with any determinations already made by the denomination. *Lamont Community Church*, 285 Mich App at 616. Said differently, when a denomination is hierarchical, Michigan courts will apply the ecclesiastical abstention doctrine and will not use neutral principles of law to resolve the dispute. [Citations omitted.]

A religious organization is part of a hierarchy when it "is but a subordinate part of a general church in which there are superior ecclesiastical tribunals with a more or less complete power of control . . . ." *Bennison*, 121 Mich App at 720. In *Lamont Community Church*, 285 Mich App at 618, this Court explained further that a denomination is organized in a hierarchical structure when it has a "central governing body which has regularly acted within its powers," in contrast to denominations that are organized in the "congregational structure," which have "all governing power and property ownership remaining in the individual churches."

In *Lamont Community Church*, the issue before this Court was whether the trial court properly determined that the church involved was a hierarchical denomination with respect to its property. *Id*. at 617. The trial court determined that the church was hierarchical with respect to doctrinal and spiritual matters as a matter of law, but held a fact-finding hearing to determine whether it was hierarchical regarding property. *Id*. at 610-611. This Court first noted that the trial court considered testimony that "went well beyond anything [it] should have considered." *Id*. at 617. This Court noted that "it is a violation of the First and Fourteenth amendments for courts to substitute their own interpretation of a denomination's constitution for that of the highest ecclesiastical tribunals in which the church law vests authority to make that interpretation." *Id*. (quotation marks and citations omitted). Thus, this Court explained that if a denomination's

-5-

constitutional provisions "are not so express that the civil courts could enforce them without engaging in a searching and therefore impermissible inquiry into church polity, courts must accept the interpretation provided by the denomination and not delve into the various church constitutional provisions relevant to this conclusion." *Id.* (quotation marks and citations omitted).

In this case, the trial court failed to consider whether the ROEA constituted a hierarchical religious organization and did not examine the nature of the relationship of Holy Ascension with the ROEA and the Orthodox Church in America. The trial court failed to consider whether the actual adjudication of the legal claims in this case required the resolution of ecclesiastical questions, including the relationships between entities within the allegedly hierarchical religious denomination. Instead, the trial court stated without explanation that it found the dispute in this case merely secular requiring it to apply the neutral-principles-of-law approach. In so doing, the trial court erred.

The record reflects that the trial court substituted its interpretation of canonical texts and ignored the decisions of the ROEA relating to government of the religious polity. The trial court disregarded the evidence presented by the ROEA that required it to abstain and defer to the ROEA's resolution of the property dispute. The record reflects that the ROEA presented evidence of the hierarchical nature of the Orthodox Church in America with which the ROEA affiliated and was a diocese. The ROEA submitted the Statute of the Orthodox Church in America, which established that the hierarchical denomination exercised jurisdiction over the ROEA and its affiliated monasteries including Holy Ascension. The Statute's Article XIII, § 2, specified that the ROEA's bylaws and the monastery's bylaws fell within the denomination's hierarchical structure and that the relationship between the monastery and the diocese's bishop was hierarchical. Under Article XIII § 3, establishment and alteration of the status or operation of the monastery had to be initiated by the bishop who served as the canonical and spiritual leader of the monastery in consultation with the ROEA's diocesan synod and council. Under Article XIII, § 4, Subpart a, monastery corporations could hold property, but Subpart b expressly provided that all "monastic property, assets, and funds, . . . are and shall be owned and held by the monastery in trust for the use, purpose, and benefit of the Diocese of The Orthodox Church in America [the ROEA] of which it is a part and in trust for the use, purpose, and benefit for The Orthodox Church in America." Under Subsection d, the diocesan bishop had authority to dispose of monastery property in consultation with the diocesan synod and council upon the monastery's ceasing to exist.

The ROEA also submitted to the trial court its Constitution and Bylaws for the trial court's consideration. Article V(c) specified that the ROEA was hierarchical and that its Episcopate Congress served as the sole legislative and highest administrative authority in secular matters. Article VI(b) provided that church properties could not be sold or alienated without the written permission of the Episcopate Council. The ROEA's Bylaws' § 1 respecting "Affiliated Institutions" specified that the ROEA could maintain and operate monasteries and that its bishop served as the head of such institutions, which could be chartered as separate legal entities.

The record reflects that the ROEA submitted Holy Ascension's 2001 original articles of incorporation, which established that the monastery submitted to the ROEA's church discipline, rules, and usages as authorized by the Orthodox Church in America. The ROEA also submitted

the monastery's 2005 Certificate of Amendment to the Articles of Incorporation with Attachment A, §§ IV and VI, that specified that the monastery "shall worship and labor together, according to the discipline, rules, and usages of Romanian Orthodox Episcopate of America" and as an affiliate of the ROEA, in the event of dissolution or disbandment, its real property would be distributed to the ROEA.

The record reflects that the monastery's bylaws, Article II, § 2.2(d), defined the monastery as an affiliated institution of the ROEA and in the event of dissolution or disbandment, its real property would be distributed to the ROEA. Article III, § 3.01(a), required monastery members to accept the teachings, traditions, and monastic rituals of the Orthodox Church of America, and they had to worship and labor according to the discipline, rules, and usages of the ROEA.

The record reflects that the ROEA also submitted for the trial court's consideration various immigration petitions and letters drafted by Duvlea while he served as the bishop of the monastery. Those documents established that Duvlea informed immigration authorities that Holy Ascension was under the canonical jurisdiction of the ROEA, a diocese of the Orthodox Church in America.

This uncontroverted evidence submitted by the ROEA leads unequivocally to the conclusion that the ROEA was a hierarchical religious institution, a diocese of and subject to the canonical law and jurisdiction of the Orthodox Church in America. The ROEA governed parishes and churches within its diocese. And Holy Ascension was within the diocese and one of its parishes was an affiliated religious institution subject to the ROEA's discipline, rules, and usages. The governing documents reflect that the monastery's members were required to accept the teachings, traditions, and monastic rituals of the Orthodox Church of America. No evidence contradicted the substantial evidence that both the ROEA and Holy Ascension were religious organizations that were part of a church denominational hierarchy and represented subordinate parts of a general church in which there were superior ecclesiastical tribunals with control over the matters presented in this case. The ROEA interpreted the denominational documents as having established that the disputed property was held in trust for an ecclesiastical body that had ruled regarding the disposition of the property. The ROEA determined that, pursuant to its constitution and bylaws and the articles of incorporation and bylaws of Holy Ascension, the property could not be alienated without church permission, and Duvlea and his followers improperly transferred the disputed property without the required authorization and knowledge of the ROEA.

Under *Schuchman*, the trial court should have considered the evidence submitted by the ROEA and determined that this case involved hierarchical religious organizations and that the actual adjudication of the legal claims required the resolution of ecclesiastical questions respecting the interrelationships of the entities within the hierarchical denomination and its interpretation of the ownership and ability to transfer or convey properties by such entities. Based on the evidence the ROEA submitted, the trial court should have declined to apply the "neutral principles of law" approach and applied the ecclesiastical abstention doctrine. The trial court's incorrect application of the law led it to focus on the deeds and the actions taken by Holy Ascension's board during the time Duvlea was under investigation for impropriety that ultimately led to disciplinary action by the Orthodox Church in America and the ROEA which

-7-

removed him from office and stripped him of authority to do any acts affecting the denomination or its property. The schismatic faction led by Duvlea created Holy Trinity, conveyed Holy Ascension's property to the schismatic faction's new entity, and then dissolved Holy Ascension without the knowledge of the ROEA or its authorization. The schismatic faction seceded from the denomination taking with them property that, pursuant to the hierarchical denomination's governing documents, belonged to the denomination.

The record reflects that, when the ROEA discovered what Duvlea and his followers were doing, the ROEA took action to preserve and protect what it understood as the church's property pursuant to the documents that governed the hierarchical church and its property. The ROEA recorded the memorandum in the Washtenaw County Register of Deeds on November 8, 2016, reciting the provisions of the ROEA's constitution and bylaws, which (1) stated that church properties could not be sold, alienated, or mortgaged without permission of the Episcopate Council, (2) specified the ROEA's authority over churches' and parishes' properties and assets, and (3) stated that in the event of heresy, schism, or defection from the ROEA, title to the property remained the property of the parish within the ROEA. The document identified the property located at 15143 Sheridan Road, Clinton, Michigan, and specified its tax parcel identification number, one of the tax parcel identification numbers specified in the warranty deed by which Leica conveyed the property to Holy Ascension. The trial court erred by ruling that the recorded memorandum constituted a cloud upon Holy Trinity and Leica's properties.

We hold that the trial court should have applied the ecclesiastical abstention doctrine and deferred to the resolution of the property issues by the ROEA respecting the disputed property and entered a judgment consistent with the ROEA's determinations already made. The trial court erred by applying the "neutral principles of law" approach, which was inapplicable in this case.

The ROEA also argues that Leica's intent for donating the disputed property lacked relevancy to the determination of the issues in this case and to the extent that the trial court based its decision on that irrelevant information it erred. We agree.

Conveyances of land are subject to the applicable statute of frauds, MCL 566.106, which provides:

> No estate or interest in lands, other than leases for a term not exceeding 1 year, nor any trust or power over or concerning lands, or in any manner relating thereto, shall hereafter be created, granted, assigned, surrendered or declared, unless by act or operation of law, or by a deed or conveyance in writing, subscribed by the party creating, granting, assigning, surrendering or declaring the same, or by some person thereunto by him lawfully authorized by writing.

Real property in Michigan is conveyed by deed. "A deed is a contract, . . . and the proper interpretation of the language in a deed is therefore reviewed de novo on appeal . . . ." *In re Rudell Estate*, 286 Mich App 391, 402-403; 780 NW2d 884 (2009) (citations omitted). "Contract language should be given its ordinary and plain meaning." *Mich Nat'l Bank v Laskowski*, 228 Mich App 710, 714; 580 NW2d 8 (1998). Deeds conveying land may contain covenants and conditions. "A covenant is an assurance that something will be done, while a

-8-

condition provides that the legal relationship of the grantor and the grantee will be affected when an event that may or may not happen takes place." *Ditmore v Michalik*, 244 Mich App 569, 582; 625 NW2d 462 (2001) quoting 2 Cameron, Michigan Real Property Law (2d ed), § 22.2, pp 1005-1006.

In this case, the trial court's opinion suggests that its decision may have been based in part upon Leica's affidavit testimony regarding his donative intent that Duvlea would run the monastery and manage the property for the rest of his life. The Warranty Deed by which Leica conveyed the disputed property to Holy Ascension did not require the grantee to do anything or refrain from doing anything. The warranty deed contained no covenants or conditions, defined no restricted uses, nor did it prohibit alienation or otherwise specify a particular purpose or limitation for the two parcels of property. The warranty deed contained no reversionary provision and made no mention of how the monastery was to use the property or how it was to be governed. Further, the warranty deed made no mention of Duvlea and did not provide that he had any legal or beneficial interest or rights in the property. The record also contains no writing or contract by which Leica separately specified covenants or conditions respecting the property that he donated and conveyed by warranty deed to Holy Ascension. By conveying the property by warranty deed without any restrictions, conditions, or covenants, he conveyed all rights, title and interest in the property. Accordingly, Leica's intent lacked relevance to the determination of any issue in this dispute, and the trial court should not have considered it. Therefore, to the extent that the trial court considered Leica's donative intent and based its ruling on such, the trial court erred.

Reversed and remanded for entry of judgment consistent with the ROEA's determinations respecting the disputed property and for entry of such orders as are necessary to fully effectuate this decision. We do not retain jurisdiction. The ROEA may tax costs.

/s/ David H. Sawyer
/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly